**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**CARDELL LAMONT AVENT,**

>    Petitioner,

v.                                                            Civil Action No. **3:11CV605**

**RANDALL C. MATHENA,**

>    Respondent.

## MEMORANDUM OPINION

Cardell Lamont Avent, a Virginia prisoner proceeding *pro se*, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Avent challenges his convictions in the Circuit Court for Brunswick County ("Circuit Court") for first-degree murder and use of a firearm during the commission of a murder.  Avent demands relief upon the following grounds:

| | |
|---|---|
| Claim A | Counsel performed deficiently by failing to introduce an audiotape of Avent's confession at trial. |
| Claim B | The introduction of the statements Avent made while in police custody in Arizona violated Avent's rights under the Fifth Amendment.[1] |
| Claim C | The prosecution violated Avent's right to equal protection by using five peremptory strikes to remove African-American jurors.[2] |
| Claim D | The prosecutor denied Avent due process by using improper arguments during the sentencing phase. |
| Claim E | In light of Avent's intoxication, the evidence was not sufficient to prove premeditation. |

---

[1] "No person shall . . . be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.

[2] "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.  U.S. Const. amend. XIV, §1.

Respondent has moved to dismiss on the ground that Claim D is defaulted and the remaining claims lack merit. Avent has responded. For the reasons set forth below, the Motion to Dismiss will be granted.

## I. APPLICABLE CONSTRAINTS UPON FEDERAL HABEAS REVEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (*citing* 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (*citing Williams v. Taylor*, 529 U.S. 362, 410 (2000)).[3]

---

[3] In light of the foregoing statutory structure, the Supreme Court of Virginia's disposition of Avent's claims figures prominently in this Court's opinion.

2

## II. FACTS PERTAINING TO AVENT'S GUILT

The Supreme Court of Virginia provided the following summary of facts and proceedings

that preceded Avent's trial:[4]

> On August 17, 2005, police officers in Brunswick County, Virginia, responded to a call for a "welfare check" on William David Thomas, Jr. ("William"), whom the caller had not seen in several days. Upon arriving on William's property, Major Brian Roberts ("Major Roberts") testified at trial that he detected a "very strong odor, like a dead carcass." Once inside William's residence, Major Roberts saw blood stains throughout the house: "in the bathtub," "in . . . the victim's bedroom upstairs," and "on the steps." When William's body was not located inside his residence, the deputies searched the curtilage of his property. The search led the officers to a "chicken coop" that had a "wood door" with "a cinderblock on the ground against it." Once deputies removed the cinderblock and opened the door, there was a "completely overwhelming," "unbelievable odor."
>
> Immediately inside the chicken coop, officers encountered "a black fender well" and "blue plastic foam insulation." Upon removing those items, "a head of a human being was exposed, and flies just swarmed." Major Roberts testified to finding a "very, very badly decomposed body." He described the head, later identified through dental records as William's, as having, "[p]art of the face almost looked like it melted off or rotted off."
>
> Captain Kent Washburn ("Captain Washburn") also testified to the presence of blood throughout the house, on walls, the bathtub, and floors. In the bucket for the well outside William's home, Captain Washburn discovered a "soiled shirt that appeared to have stained blood on it, and there was a hole in the chest area." Officers also recovered a comforter, a sheet to a bed, and gun parts from the well. The bed in William's bedroom had no sheets on it, and there were "ammonia and bleach bottles" in his bedroom. A piece of the gun had "gr[a]y duct tape" on it and the name "Winchester."
>
> After receiving a "Crime Solver's tip," Major Roberts and Captain Washburn traveled to the Navajo County Jail in Kayenta, Arizona, where they encountered Avent and Thomas, daughter of decedent William; both Avent and Thomas were "people of interest in this murder case." During their time together, Major Roberts observed no injuries on Avent. Captain Washburn interviewed Avent and testified that Avent's demeanor during the interviews was "[v]ery calm; no signs of being nervous or upset; showed no emotion; no signs of crying; and basically, did not ask anything about the Thomas family."

---

[4] Meloni Thomas ("Thomas") was tried and convicted separately from Avent for her participation in the murder of William David Thomas, Jr. *See Thomas v. Commonwealth*, 688 S.E.2d 220 (Va. 2010).

Over two days of interviews, Captain Washburn advised Avent of his *Miranda*[5] rights and had Avent sign a written *Miranda* waiver. Captain Washburn obtained "three written statements" from Avent, one in Avent's own handwriting, the other two in question-and-answer format transcribed by Captain Washburn, which detailed Avent's involvement in William's death. Avent signed each page of his statements. Captain Washburn made an audio recording of the last statement Avent gave on the first day of interrogation in Arizona. During the trial the audio recording was played for the jury.

*Avent v. Commonwealth*, 688 S.E.2d 244, 247–248 (Va. 2010) (all alterations in original, except

for footnote citation for *Miranda*; omissions in original; internal footnotes omitted).[6]

At trial, Captain Washburn read Avent's written statements into evidence. In Avent's hand-written statement, Avent stated that he, Thomas and her three children went to William's house so Thomas could "get her checks." Thomas entered William's house "[t]hrough a window on the porch. She moved the storm door and went inside through a window." His narrative continued:

[Thomas] went in the house to get her checks. I heard arguing, so I went in the house. Next thing I know, I was hit. I falled [sic] down on the floor while still being hit. I, Cardell, looked up and it was her father. He then put his hands around my neck and started choking me. I was afraid for my life. I started wiggling trying to get away.

He stopped and went upstairs. I followed behind him slow to see what he was doing. When I got upstairs, I was hit with a board a few times. Once again, I was afraid for my life, so I turned my head away, at the same time, pulled out the gun and shot it one time; not noticing where I was shooting at, I just wanted him to stop hitting me. I turned back around, and he was running towards me still, so I took the gun and only hit once. He was still fighting me, so I kept on hitting him until he stopped. [Thomas] then came upstairs.

I was scared, so we dragged him outside to the shed. I then went to the car to check on the kids. After I checked on the kids, I went to see what [Thomas] was doing. She was cleaning up. I wiped off a few things, I can't remember what they are, and then we left. Got to North Carolina, she gave her checks to John, and we came to Arizona.

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Prior to trial, Avent moved to suppress the statements he gave in Arizona. *Avent*, 688 S.E.2d at 248. The Circuit Court denied the motion. *Id.*

4

In response to Captain Washburn's questions, Avent estimated that the altercation with William occurred "between August 7th and the 11th of 2005" at "around 1:00 P.M. or 2:00 P.M." Avent said that he followed William upstairs because he "was mad, because [William] had choked [him]." Avent "wanted to tell [William] that [William] was wrong for hitting [Avent] and tell him why [Avent] was down the[re], but [William] kept hitting [Avent]." When Avent got upstairs, William "swung a board at [Avent] and kept on swinging." Avent told Captain Washburn that he was "bleeding somewhere on [his] head" as a result of the fighting with William.

Avent stated that he hit William in the face three to five times with the barrel of a sawed-off shotgun. After he stopped hitting William, Avent "was leaning up against the wall and [his] head was hurting." Avent acknowledged that he assisted Thomas in removing William's body from the house, stating that he "was tired and help[ed] her drag the best I could, but [Thomas] did most of the dragging."

Avent described the shotgun as an old, two-foot long, single-barrel Winchester with gray duct tape on it. When asked about the gun's whereabouts, Avent answered that he "threw some pieces in the wood[ ]s while we were riding down the road. I threw them out of the car window, somewhere in North Carolina." Avent also threw away a black hooded-type jacket that he was wearing during the assault.

In the statements recorded by Captain Washburn, Avent asserted that Thomas had placed the gun parts, bed sheet, comforter, and towels in the well, Thomas put William's body in the shed and covered him up with the black fender well, and Thomas closed the shed door and put a brick behind the door. Avent stated that he had "never shot [the gun] until that day at [William's] house."

During the interviews, which took place approximately two weeks after William's body was recovered, Captain Washburn photographed portions of Avent's body that Avent identified as being injured. Captain Washburn was not able to "see any visible injury" either on Avent's head where he contended he bled after being hit by a board, or on his neck where he claimed William had choked him. Captain Washburn did observe a "bruise on [Avent's] left arm and also a mark on his left leg," both of which were the size of a dime or smaller. Avent said the injuries to his arm and leg came from "the struggle." Captain Washburn recovered various pieces of wood around the crime scene, including one in the well, which were "only . . . small pieces of wood," about "the size of two fingers put together."

Other people saw Avent shortly after the incident. John Bass ("Bass") testified that he met Avent and Thomas at a fast food restaurant in Roanoke Rapids, North Carolina on the day in question in response to Thomas' request that he cash a check for her. Bass got within "15, 20" feet of Avent and he did not notice any visible signs of injury or anything that suggested that he was injured. Tami Rose saw Avent in Arizona on approximately August 14th. She did not notice any injury to Avent.

5

Lieutenant Reeder Nez ("Lt. Nez") of the Department of Criminal Investigation for the Navajo Nation, in Kayenta, Arizona, testified that Kayenta, Arizona, is "really a remote area" located on the Navajo reservation. On September 1, Lt. Nez went to a residence in Arizona where he found Avent. Lt. Nez testified that Avent neither seemed injured nor emotional in any way.

Crime scene investigators testified about the state of William's house. Special Agent Thomas Embry was responsible for the exterior crime scene. He testified that the distance from William's house to where the body was discovered was 123 feet. Forensic scientist James Bullock testified that the wood and metal pieces recovered from the scene of the crime came from the shotgun admitted into evidence.

A forensic expert, Marjorie E. Harris, testified that "a blood source [underwent forcible] events in the threshold of [William's] bedroom, and [blood flew] out into the hallway." She observed "so much [blood] that it actually drained through the holes in the floor." There was blood spatter indicating trauma both while the victim was upright, and while he was supine. She concluded that the blood patterns in William's room were consistent "with one sequence of events where the injury begins in the northeast corner with the blood source high. The blood source is mobile, travels, ends up in the threshold of the door, is now low, and then is consequently moved out of the bedroom . . . across the hallway, down the steps."

Dr. Bill Gormley ("Dr. Gormley"), Assistant Chief Medical Examiner, testified that the cause of William's death "was certified as blunt force injury to the head." William's skull had "comminuted fractures of the . . . facial skeleton [and] rare small metallic foreign bodies." William had sustained a fracture of the right radius, and his chest contained multiple small fragments of metal. Dr. Gormley testified that William was missing portions of his skull due to the extensive fractures and decomposition, and William's lower mandible was dramatically displaced. Dr. Gormley concluded that the shotgun wound or wounds were not necessarily lethal, but rather William died from the blunt force trauma to his skull.

*Id.* at 249–251 (alterations in original; omissions in original).

The Supreme Court of Virginia aptly summarized the defense's case as follows:

Avent testified that he had smoked an entire six-inch "blunt" of marijuana and consumed a 32-ounce bottle of Colt 45 beer approximately "30, 35 minutes before" he arrived at William's house. Avent stated that he was "pretty much high" when he arrived at William's house, and he was intoxicated during the assault.

Avent testified that he and Thomas, along with Thomas' three sons, had gone to William's house to get Thomas' checks. Thomas entered the house and was inside for "10 or 15 minutes" when Avent heard "arguing" and a "loud bang

6

noise." Avent claimed that he retrieved the shotgun from the trunk of the car and brought the gun into the house concealed in his pants in response to the "loud banging noise," and because he was "paranoid" and "scared" as a result of "smoking [marijuana] and drinking [alcohol]" Avent testified that he went into "the house to get [Thomas] out of the house before she get herself into any trouble or whatever." Avent stated that he did not plan on killing, assaulting, or injuring William when he entered the house.

According to Avent, William attacked him and struck him multiple times in the face with "his fist and his hand" once Avent entered from the outside into the kitchen. Avent also asserted that William said, "Nigger, what are you doing in my house?" while he was striking Avent. Avent claimed that William hit Avent three times "at the most" and choked him as well. Avent stated that William's attack "put fear in [him]. [He] was scared and [he] was mad" because he felt William was "really going to hurt" him, and because he thought William was attacking him "just because of the color of [his] skin."

When the choking ceased, William "got up and he said, 'I got something for you.'" William then "turned around . . . and started going towards the stairs and up the stairs." Avent testified that he "had a good idea that [William] was going to get a gun." Avent followed William "upstairs behind him to stop him and tell him I wasn't there to fight him" because he was aware that Thomas' sons were in the car and Avent "wasn't going to go out to the car and put the kids' life on the line."

Avent claimed that once Avent got upstairs, William "hit [him] in the back of [his] head . . . [w]ith a board" which caused bleeding from "the back left of [his] head." Avent testified that he "got madder and madder" because he "was telling [William] the whole time" William was hitting him that Avent "wasn't there to fight him." In addition to the injury to his head, Avent stated that he suffered injuries "on both of [his] arms . . . as far as knots and swelling" and "knots and swelling and a bruise on [his] left leg, too."

Avent testified that he was "holding up [his] arms" to protect himself from William, and finally drew the shotgun because he "just got so mad that [William] kept on hitting" him and because he "was scared of [William] possibly taking [his] life and hurting" him. Avent stated that when he fired the shotgun at William, William was "30 feet" away from Avent. Avent was unable to answer whether William was "moving towards" him or away from him when Avent shot him. Avent asserted that he "just pulled out the gun, turned [his] head away and shot" the gun.

After Avent shot William, a fight ensued. Avent testified that William "still came towards" Avent and William "was swinging." Avent testified that he "got madder and madder, so I hit him back hard one time. He fell down on the floor, and I just continued to hit him" with the barrel of the gun. William fell after Avent hit him one time, and Avent stated "I think he lost or he dropped the board as soon as he fell and hit the floor" and he never regained possession of the board. Avent testified that while William was on the ground, Avent "was bending

7

over," striking him with the shotgun.  Avent stated that after he stopped hitting William, Avent "had got overheated and blacked out, and [he] fell to the floor."

Avent asserted that he was dazed for a "split-second," and when he regained consciousness, he helped Thomas remove William's body from the house because he was scared.  He also took the board William used to hit him because he was scared and "wanted to get rid of the evidence that was there."  Avent and Thomas were cleaning up the scene for approximately "30 minutes" and they then left together, first for North Carolina and then Arizona.

Avent conceded that he had not been truthful when he told investigators that he had never fired the shotgun prior to that time, stating that he "simply forgot."  Avent added that during his interrogation, Major Roberts had threatened him with a capital murder charge if he did not cooperate and as a result Avent was scared and "in like a shock state or zone."  Avent also contended that most of his injuries had healed by the time the officers interviewed him in Arizona.

On cross-examination, Avent conceded that on the audio recording, the final question asked was whether Avent "had anything else at all to say about what had happened."  Despite that opportunity, Avent admitted that during the interrogation he made no mention of the loud banging noise, his use of drugs or alcohol, William's use of a racial slur, the threat Major Roberts allegedly made to him, or Avent's disposal of the board he alleged William had used to attack him.  On several occasions in his testimony, Avent responded that there were a number of things he and Captain Washburn had discussed that were not in his written statements.

*Id.* at 252–53 (omissions and alterations in original).  The jury found Avent guilty of first degree

murder and use of a firearm during the commission of a murder.  The Circuit Court sentenced

Avent to life imprisonment on the murder charge and three years of imprisonment on the firearm

charge.

### III. PROCEDURAL HISTORY

Avent appealed his conviction.  In his petition for appeal to the Supreme Court of

Virginia, Avent raised the following errors:

1. The Court erred in refusing to grant the defense counsel's Motion to
Suppress his statements on the grounds that they were not voluntary.
2. The Court erred when it denied defense counsel [sic] *Batson*[7]motion.
3. The Court erred by refusing to allow in evidence of the defendant's state of
mind as it pertained to the defenses of voluntary manslaughter and self-defense.

---

[7] *Batson v. Kentucky*, 476 U.S. 79 (1986).

8

4. The Court erred in refusing to grant the defense counsel's Motion to Strike on the basis that the defendant acted in self-defense.

5. The Court erred in refusing to grant the defense counsel's self-defense jury instruction.

6. The Court erred in failing to find the defendant guilty of voluntary manslaughter, and in failing to thus, acquit him of use of a firearm.

7. The Court erred in failing to grant defense counsel's motion for a mistrial on the basis of improper argument at the penalty phase by the Commonwealth.

8. The Court erred by denying the defense counsel's motion for a new trial based on after-discovered evidence.

9. The defendant should have been acquitted of first degree murder as the element of premeditation was negated by intoxication.

10. The Court erred when it found that there was sufficient evidence to find that the defendant premeditated, as to support a conviction for first degree murder.

Opening Brief of Appellant at 13–14, *Avent v. Commonwealth*, 688 S.E.2d 244 (Va. 2010) (No. 090537) (internal citations omitted). On January 15, 2010, the Supreme Court of Virginia affirmed Avent's convictions and sentence. *Avent v. Commonwealth*, 688 S.E.2d 244, 262 (Va. 2010).

Thereafter, on January 3, 2011, Avent filed a petition for a writ of habeas corpus with the Supreme Court of Virginia. In that petition, Avent raised his present Claim A. On June 3, 2011, the Supreme Court of Virginia dismissed Avent's state habeas petition. *Avent v. Warden, Wallens Ridge State Prison*, No. 110014, at 3 (Va. June 3, 2011).

## IV. EXHAUSTION AND PROCEDURAL DEFAULT

State exhaustion "'is rooted in considerations of federal-state comity,'" and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (*quoting Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n. 10 (1973)). The purpose of the exhaustion requirement is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971)

(internal quotation marks omitted).  Exhaustion has two aspects.  First, a petitioner must utilize all available state remedies before he can apply for federal habeas relief.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999).  As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate opportunity to address the constitutional claims advanced on federal habeas.  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (*quoting Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)).  Fair presentation demands that "'both the operative facts and the controlling legal principles'" must be presented to the state court.'"  *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (*quoting Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)).  The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner.  *Mallory v. Smith*, 27 F.3d 991, 994, 995 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default."  *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).  This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim."  *Id.*

10

(*citing Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when the "petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (*quoting Coleman*, 501 U.S. at 735 n.1).[8] The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citing cases). Absent a showing of cause and prejudice or a fundamental miscarriage of justice, this Court cannot review the merits of a defaulted claim. *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

With respect to Claim D, on direct appeal to the Supreme Court of Virginia, Avent asserted that the prosecutor's allegedly improper comment violated state law. Opening Brief of Appellant at 32–33, *Avent v. Commonwealth*, 688 S.E.2d 244 (Va. 2010) (No. 090537). Therefore, Avent has failed to exhaust his current challenge that prosecutor's comment violated Avent's federal right to due process. *Baldwin*, 541 U.S. at 29 (*quoting Duncan*, 513 U.S. at 365–66). Moreover, if Avent now attempted to return to the Supreme Court of Virginia to exhaust the federal constitutional aspects of Claim D, that court would find the claim defaulted pursuant to the rule in *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974)) because Avent could have, but failed to, raise the claim on direct appeal. *Slayton* constitutes an adequate and independent state procedural rule when so applied. *See Mu'Min v. Pruett*, 125 F.3d 192, 196–97 (4th Cir. 1997). Thus, Avent has procedurally defaulted Claim D unless he demonstrates cause and prejudice to excuse his default or a fundamental miscarriage of justice.

---

[8] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (*citing Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

Avent contends the deficient performance of appellate counsel constitutes cause to excuse his default. (Pet'r's Resp. Resp't's Mot. Dismiss & Pet'r's Mot. Strike 2–3.) To establish ineffective assistance of appellate counsel, a petitioner must demonstrate deficiency and prejudice, as required by *Strickland v Washington*, 466 U.S. 668 (1984). *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000). Appellate counsel has no obligation to raise all non-frivolous issues on appeal. *Smith v. Murray*, 477 U.S. 527, 536 (1986) ("[W]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (internal quotation marks omitted). To the contrary, appellate counsel must review the record and "select[ ] the most promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752 (1983). To overcome the presumption that appellate counsel chose the most promising issues for appellate review, a petitioner must demonstrate that ignored issues were "'clearly stronger'" than those presented. *Jarvis*, 236 F.3d at 164 (*quoting Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

On direct appeal, Avent challenged the following comment by the prosecutor during the penalty phase:

> Now, the second thing that I'd ask that you consider, not only as punishment for him, but the second thing is to look at the danger he would pose if he wasn't in prison because if you do anything else less than life, anything less, then one day he's going to walk out of that prison cell, and he's going to come back in this society.

*Avent v. Commonwealth*, 688 S.E.2d 244, 260 (Va. 2010).[9] Avent simply cannot demonstrate that the prosecutor's comments about his future dangerousness denied him due process or that

---

[9] Appellate counsel asserted the foregoing comment ran afoul of Virginia law which provides "that a 'prosecutor's request . . . must not appeal . . . to the jurors' passions by exciting their personal interests in protecting the safety and security of their own lives and property.'"

12

appellate counsel acted deficiently by omitting the issue. *See Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (citing cases for the proposition "that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system"). Accordingly, Claim D will be DISMISSED.

## V. ALLEGED ERRORS THAT PRECEDED THE GUILT PHASE

### A.    Denial of the Motion to Suppress

In Claim B, Avent contends that the statements he made to police officers resulted from unconstitutionally "coercive Police activity due to the duration of time that Petitioner was held and question[ed], and the threatening remarks that were made to him." (Br. Supp. § 2254 Pet. 6.)[10]   Specifically, Avent complains, "He was interrogated in at least two sessions—one averaging three and a half to four hours and the other around two hours." (*Id.* at 9.) Avent further notes that he was "threatened with capital murder charges." (*Id.* (spelling corrected).)

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused. *Jackson v. Denno*, 378 U.S. 368, 376 (1964). A defendant seeking to exclude a statement as involuntary must demonstrate that his "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). In determining the issue of voluntariness, a court must consider "'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The surrounding

*Avent*, 688 S.E.2d at 260 (omissions in original) (*quoting Hutchins v. Commonwealth*, 255 S.E.2d 459, 460–61 (Va. 1979))).

[10] Avent notes that authorities in Arizona held him in a local jail for two nights prior to the questioning.

circumstances include "not only the crucial element of police coercion," but also "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (internal citations omitted).

In assessing the voluntariness of Avent's statements, the Virginia court's factual findings regarding the surrounding circumstances of those statements are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *Greene v. Dir., Dep't of Corrs.*, 1:10cv638 (AJT/TRJ), 2011 WL 796509, at *4 (E.D. Va. Mar. 1, 2011). The Supreme Court of Virginia summarized the evidence from the suppression hearing as follows:

> Major Roberts, Captain Washburn, and Avent each testified at the hearing on the motion to suppress.
> Major Roberts testified that Avent was neither threatened nor offered leniency in exchange for his cooperation. Captain Washburn testified that the interrogation lasted "roughly three and a half hours, four hours. It was on and off, after [Avent] had been given breaks" to use the restroom and to have something to drink. Avent was fed dinner and never complained of discomfort.
> Major Roberts was only present for the "initial meeting," in which Avent was given *Miranda* warnings and made his first verbal statement. Major Roberts "got disgusted" with the "lies" Avent told the officers during the first interview and so Major Roberts "got up and walked out and went back to interview" Thomas.
> Avent described himself during the interrogation as "calm" and "comfortable." Avent further testified that he had been given food and an opportunity to sleep, and he was given his *Miranda* rights. He testified that while he understood the rights, he did not waive those rights until *after* his interrogation. Avent said he was "scared" after Major Roberts "got so mad that he slammed his hand down on the table and told me . . . if I didn't cooperate with him . . . that they were going to charge my ass with capital murder and that's a life or death sentence."
> Avent testified that the officers never touched him, and he did not feel threatened or scared by Captain Washburn. On a number of occasions during the hearing, Avent responded that he understood what was occurring during the interrogation.

*Avent v. Commonwealth*, 688 S.E.2d 244, 248–49 (Va. 2010).

14

The Virginia courts did not credit Avent's assertion that the police had threatened him to obtain his statements. *See id.* at 249 (finding "there was 'no threat of a murder charge, no threat of physical harm, [and] no promises of leniency'") (alteration in original); *see also id.* at 255. Additionally, "the trial court found that Avent was 'a man of at least average intelligence.'" *Id.* at 249. The Supreme Court of Virginia concluded that the Circuit Court properly denied Avent's motion to suppress because "[Avent's] will was not overborne and his capacity for self-determination was not impaired. Avent was apprised of his *Miranda* rights by the interrogating officer, he was given food and an opportunity to sleep, and he described himself as 'calm' and 'comfortable' throughout the questioning." *Id.* at 255.

Given the foregoing record and Avent's failure to rebut the finding that the police did not threaten him, Avent fails to demonstrate his statements to the police were involuntary. The totality of the circumstances supports the determinations of the state courts that Avent voluntarily provide the statements to the police. *See United States v. Byers*, 649 F.3d 197, 215–17 (4th Cir.) (rejecting defendant's contention that his statement was involuntary because, *inter alia*, he made statement after being held in interview room for fourteen hours), *cert. denied*, 132 S. Ct. 468 (2011). Accordingly, Claim B will be DISMISSSED.

**B.     Jury Selection**

In Claim C, Avent raises a challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson*, the Supreme Court held that the Equal Protection Clause prohibits the use of peremptory challenges to exclude jurors on the basis of race. *Id.* at 89. Courts use a three-step process for evaluating whether the use of a peremptory challenge was based on purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008). First, the defendant must

15

make a prima facie case of racial discrimination. *Id.* at 476 (citation omitted). Second, after such showing is made, the state must suggest a race-neutral explanation for the use of the strike. *Id.* at 477 (citation omitted). Third, after a race-neutral reason is offered, the trial court must decide whether the defendant has shown purposeful discrimination. *Id.* (citation omitted). "Whether a peremptory strike was motivated by race is ultimately a question of fact, *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), and a state court finding is accorded a presumption of correctness under AEDPA, 28 U.S.C. § 2254(e)(1)." *Cole v. Roper*, 623 F.3d 1183, 1188 (8th Cir. 2010) (parallel citations omitted), *cert. denied*, 132 S. Ct. 147 (2011). Therefore, the Virginia courts' determination that race did not motivate the prosecutor's peremptory strikes may only be set aside if Avent adduces clear and convincing evidence rebutting that determination. *Id.*

Here, the prosecution used five of its peremptory strikes to remove the following African American jurors: Randolph Meredith, Thelma Taylor, Frema Draughn, Chiquita Easter, and Patrick McFarland. (Trial Tr. 156–57.) The prosecutor stated that he struck Meredith because Meredith knew both Avent and Avent's brother, Dewitt Avent. (*Id.* at 157.) Additionally, during the prosecutor's current term of office, Meredith had been convicted of one criminal offense and charged with another criminal offense. (*Id.*) The prosecutor explained that he had struck Taylor because, *inter alia*, Taylor equivocated about her ability to return a verdict of guilty, the prosecutor had prosecuted a member of Taylor's family, and Taylor had passed a bad check. (*Id.* at 158.) The prosecutor stated he had struck Draughn because the police recently had caught her son in possession of marijuana and because of Draughn's affiliation with St. Paul's

16

College.[11] (*Id.* at 159.) The prosecutor stated he struck Easter because she appeared to be sleeping during voir dire, she had been sued multiple times in civil matters, and because Easter indicated she was disabled. (*Id.* at 159–60.) Finally, the prosecutor asserted he struck McFarland because McFarland had a half a dozen traffic infractions during the last ten years and he "seemed not to be paying attention to what [the Circuit Court] was saying." (*Id.* at 160–61.) After reviewing each of the above explanations, the Circuit Court "accept[ed] the facts as related by the Commonwealth" (*id.* at 165), and rejected Avent's contention that purposeful discrimination motivated the prosecution's peremptory strikes.

In his § 2254 Petition, Avent simply reiterates that the prosecution used its peremptory strikes against African American jurors. Avent does not, as he must, direct the Court to clear and convincing evidence to rebut the Circuit Court's factual finding that race did not motivate the prosecution's peremptory strikes. *See Cole*, 623 F.3d at 1188–89; *Evans v. Smith*, 220 F.3d 306, 313 (4th Cir. 2000). Accordingly, Claim C will be DISMISSED.

## VI. ALLEGED ERRORS DURING THE GUILT PHASE

### A.    Proof of Premeditation

In Claim E, Avent challenges the sufficiency of the evidence to support his first-degree murder conviction. Avent contends that his intoxication rendered him incapable of acting with deliberation or premeditation. In evaluating Avent's claim of insufficient evidence, the relevant question for this Court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the [element of premeditation or deliberation] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (*citing*

---

[11] The prosecutor explained that friction existed between his office and St. Paul's College. (Trial Tr. 159.)

*Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).   The Supreme Court of Virginia aptly recounted the substantial evidence reflecting that Avent's alleged use of marijuana and alcohol did not prevent Avent from acting with premeditation and deliberation in murdering William:

> The facts adduced at trial indicate that Avent provided a detailed recollection of the chronology of events to the investigating officers, and again in his trial testimony.  Avent testified to entering Thomas' house carrying a shotgun "to protect" himself after he "heard a loud banging noise."  Avent followed Thomas upstairs "telling him the whole time that I wasn't there to fight him, I just wanted to get his daughter and go," rather than flee from the house because he "wasn't going to go out to the car and put the kids' life on the line."  Avent also testified that when Thomas assaulted him, he "was afraid he was really going to hurt me, and [Avent] was mad at the same time because [Thomas] was attacking [Avent] because of the color of [Avent's] skin."  Following William's death, a "scared" Avent worked with Thomas to move the body and clean the house.
>
> From Avent's own testimony, it is clear that on the day in question Avent comprehended what was occurring, he recalled the chain of events, and he articulated reasons for his reaction to the developing situation in a way that supports a finding that he was capable of deliberation despite his consumption of intoxicants.

*Avent v. Commonwealth*, 688 S.E.2d 244, 258 (Va. 2010) (alterations in original).   Viewed in the light most favorable to the prosecution, the evidence amply supports the conclusion that Avent acted with premeditation and deliberation in murdering William.[12]   Accordingly, Claim E will be DISMISSED.

## B.   Ineffective Assistance of Trial Counsel

In Claim A, Avent contends counsel performed deficiently by failing "to have audiotape confession of Petitioner properly introduced into evidence."   (Br. Supp. § 2254 Pet. 3 (capitalization corrected).)   To demonstrate ineffective assistance of counsel, a defendant must show first, that counsel's representation was deficient and second, that the deficient performance

---

[12] Indeed, the physical evidence fully supports the prosecution's theory that Avent chased William up the stairs to the bedroom, shot William from across the room, and then beat William to death with the shotgun.

prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (*quoting Strickland*, 466 U.S. at 689). The second component of *Strickland*, the prejudice component, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Strickland*, 466 U.S. at 697.

Avent cannot demonstrate that counsel performed deficiently or that Avent was prejudiced.[13] In rejecting this claim, the Supreme Court of Virginia correctly observed,

> The record, including the trial transcript, demonstrates that Lieutenant Washburn read petitioner's three signed written statements to the jury, in which petitioner admitted shooting the decedent and hitting him repeatedly with a gun, hiding his body, and fleeing to Arizona, but stated he was acting in self-defense as the decedent was the initial aggressor. On cross-examination of Washburn, petitioner's counsel played petitioner's audiotaped confession, which consisted of petitioner's third written statement, in which petitioner stated he hit the decedent in the face with a gun three to five times. Petitioner's counsel did not move to introduce the audiotape itself into evidence. During deliberations, the jury requested the audiotaped confession. The trial court denied the request as the audiotape was not a trial exhibit, but instructed the jury they could consider what they heard in addition to the other evidence. Petitioner fails to proffer a rationale as to why counsel should have determined it would be to petitioner's benefit to have the audiotaped confession accompany the jurors to deliberations, or how it would have swayed any juror in his favor. Petitioner also fails to identify any

---

[13] Avent suggests that, if the jury had been able to listen to the tape during their deliberations, the jury might have concluded that the police had coerced Avent's confession. (Br. Supp. § 2254 Pet. 5.)

particular portion of the confession that would have affected the outcome of the
trial had the jurors been permitted to play it during deliberations.

*Avent v. Warden, Wallens Ridge State Prison*, No. 110014, at 2 (Va. June 3, 2011).  Given the
abundant evidence of Avent's guilt, no reasonable probability exists that he would have been
acquitted if counsel had introduced the audiotape into evidence.  Claim A will be DISMISSED
because Avent has not demonstrated deficiency or prejudice.

## VII. CONCLUSION

The Motion to Dismiss (Docket No. 9) will be GRANTED.  Avent's Motion to Strike
(Docket No. 13) will be DENIED.  The petition for a writ of habeas corpus will be DENIED.
The action will be DISMISSED.  A certificate of appealability will be DENIED.[14]

An appropriate Order shall accompany this Memorandum Opinion.

/s/

John A. Gibney, Jr.
United States District Judge

Date: 8/6/12
Richmond, Virginia

---

[14] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge
issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A).  A COA will not issue
unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C.
§ 2253(c)(2).  This requirement is satisfied only when "reasonable jurists could debate whether
(or, for that matter, agree that) the petition should have been resolved in a different manner or
that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v.
McDaniel*, 529 U.S. 473, 484 (2000) (*quoting Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).
No law or evidence suggests that Avent is entitled to further consideration in this matter.